UNITED STATES of America, Plaintiff,

v.

STATE OF NEW YORK, George E. Pataki, Governor of the State of New York, Brian J. Wing, Acting New York State Commissioner of Social Services, Barbara A. DeBuono, New York State Commissioner of Public Health, James L. Stone, New York State Commissioner of Mental Health, Thomas A. Maul, New York State Commissioner of Mental Retardation and Developmental Disabilities, Richard P. Mills, New York State Commissioner of Education, John L. Behan, Director of the New York State Division of Veterans Affairs, Walter G. Hoefer, Director of the New York State Office for the Aging, Jean Somers Miller, New York State Commissioner of Alcoholism and Substance Abuse, Alexander F. Treadwell, New York State Secretary of State, Robert R. Snashall, Chairman of the New York State Workers' Compensation Board, Marva L. Hammons, Commissioner of Human Resources of the City of New York, and Thomas R. Wilkey, Executive Director of the New York State Board of Elections, in their official capacities, Defendants.

DISABLED IN ACTION OF METROPOLITAN NEW YORK; Jovita Acosta; Tisheca Luckey, Plaintiffs,

v.

Marva L. HAMMONS, Administrator, New York City Human Resources Administration, in her official capacity; Barbara A. DeBuono, Commissioner, New York State Department of Health, in her official capacity; Brian J. Wing, Acting Commissioner, New York State Department of Social Services, in his official capacity, Defendants.

Nos. 96–CV–5562 FB, 96–CV–5864 FB.

United States District Court,
E.D. New York.

May 7, 1998.

Zachary W. Carter, United States Attorney, Eastern District of New York, by Sanford M. Cohen, Assistant United States Attorney, Brooklyn, New York and Judybeth Greene, Washington, D.C., for plaintiff United States of America.

Community Service Society, by Jonathan Feldman, New York City, for the plaintiffs Disabled in Action of Metropolitan New York, Inc., Jovita Acosta and Tisheca Luckey.

Michael D. Hess, Corporation Counsel of the City of New York by Paul Marks, Assistant Corporation Counsel, New York City, for defendant Marva L. Hammons.

Dennis C. Vacco, Attorney General of the State of New York by Vincent Leong, Assistant Attorney General, New York City, for defendants State of New York, George E. Pataki, Brian. J. Wing, Barbara A. DeBuono, James L. Stone, Thomas A. Maul, Richard P. Mills, John L. Behan, Walter G. Hoefer, Jean Sommers Miller, Alexander F. Treadwell, and Robert R. Snashall.

Peter S. Kosinski, Patricia Murray, Special Counsel, Albany, NY, for defendant Thomas R. Wilkey.

### MEMORANDUM AND ORDER

BLOCK, District Judge.

The two above-captioned actions challenge the "agency-based" voter registration system that was implemented by the City and State of New York in response to the enactment of the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C. § 1973gg *et seq.* The discrete legal issue posed by the motions which are the subject of this decision is whether the State is required to designate the approximately 1,600 public and private hospitals, nursing homes, clinics, and other community-based organizations that process Medicaid applications in the City (the "subject facilities" or "facilities") as mandatory voter registration sites pursuant to this Congressional act. For the reasons that follow, the Court concludes that these facilities need not be so designated.

In case number 96–CV–5562, the plaintiff is the United States of America ("the Gov-

ernment"), and the defendants are the State of New York ("State"), eleven State officials, including Governor George E. Pataki (collectively "the State defendants"), and Marva L. Hammons in her capacity as Commissioner of the Human Resources Administration ("HRA") of the City of New York ("City").[1] In case number 96–CV–5864, the plaintiffs are Disabled in Action of Metropolitan New York, Inc. ("DIA"), a New York-based not-for-profit organization that advocates on behalf of the disabled, and two individuals, Jovita Acosta and Tisheca Luckey (collectively "the DIA plaintiffs"). The defendants are the Commissioner of HRA, the State Health Commissioner, and the Acting State Commissioner of Social Services.

There are three motions pending before the Court. The Government and the DIA plaintiffs each move for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking a declaratory judgment that HRA and the State defendants are required to designate the subject facilities as voter registration sites, thus ensuring that the facilities offer all Medicaid applicants the full range of voter registration services mandated by the NVRA. The Government contends that the subject facilities are so critical to .the administration of the City's Medicaid system that they constitute *de facto* arms of the HRA that must therefore provide voter registration assistance to all applicants. HRA has also moved for partial summary judgment, contending that, as a matter of law, the subject facilities need not be designated as voter registration sites. Because of the considerable overlap between the two cases, the three motions are consolidated for disposition.

## BACKGROUND

In order to evaluate plaintiffs' argument that the NVRA requires voter registration at the subject facilities, the Court will first discuss the NVRA, and then turn to a general discussion of the manner in which Medicaid applications are processed within the City.

1. On February 18, 1997, Lillian Barrios–Paoli succeeded Marva L. Hammons as the Commissioner of the New York City Human Resources Administration. Thus, Barrios–Paoli should be

## I. The NVRA

The NVRA, also known as the "motor-voter" law, was designed to "establish procedures ... [to] increase the number of eligible citizens who register to vote in elections for Federal office" and "to enhance[ ] the participation of eligible citizens as voters in elections for Federal office." 42 U.S.C. § 1973gg(b)(1), (2); *see also Association of Community Organizations For Reform Now (ACORN) v. Miller*, 129 F.3d 833, 834–835 (6th Cir.1997); *Association of Community Organizations for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 792–793 (7th Cir.1995). To that end, the NVRA requires that states, in addition to any other method of voter registration allowed by state law, establish procedures for three separate methods of voter registration: (1) by application made simultaneously with an application for a driver's license; (2) by mail application; and (3) by application at certain designated federal, state, and non-governmental office sites, also known as "agency-based" registration. 42 U.S.C. § 1973gg–2(a).

Section 1973gg–5 of the NVRA implements a two-tiered approach to agency-based voter registration. First, each state is required to designate as voter registration agencies "all offices in the State that provide public assistance." 42 U.S.C. § 1973gg–5(a)(2)(A), (B). In the conference report that accompanied the final version of the NVRA, Congress indicated that "[by] public assistance agencies, we intend to include those State agencies in each State that administer or provide services under the food stamp, medicaid, the Women, Infants and Children (WIC) and the Aid to Families With Dependent Children (AFDC) programs." H.R.Conf.Rep. No. 103–66, 103rd Cong., 1st Sess. (April 28, 1993) ("Conf.Rep."), at 19. The legislative history further indicates that the purpose of the mandatory agency-based registration program was "to supplement the motor-voter provisions of the bill by reaching out to those citizens who are likely not to benefit from the

substituted in place of Hammons. Fed.R.Civ.P. 25(d). No further action need be taken to continue this suit.

State motor-voter registration application provisions." H.R.Rep. No. 103–9, 103rd Cong. 1st Sess. (February 2, 1993) ("House Rep."), at 12. Thus, "[a]gency-based voter registration provides a useful supplement to motor-voter registration systems, [and] enables more low income and minority citizens to become registered. . . ." Sen.Rep. 103–6, 103rd Cong., 1st Sess. (February 25, 1993) ("Sen.Rep."), at 14.

In addition to these mandatory voter registration sites, each state must select an unspecified number of other offices within the state to serve as voter registration sites. These alternative sites are sometimes referred to as "discretionary" voter registration sites, although this is something of a misnomer in that each state is *required* to designate other offices as voter registration sites and may exercise discretion only in deciding precisely which sites to designate. "Discretionary" sites may include state or local government offices, such as public libraries, public schools, offices of city and county clerks, fishing and hunting license bureaus, government revenue offices, and unemployment insurance offices. 42 U.S.C. § 1973gg–5(a)(3)(B)(i). Notably, discretionary sites may also include "Federal and non-governmental offices, *with the agreement of such offices.*" 42 U.S.C. § 1973gg–5(a)(3)(B)(ii) (emphasis added). Moreover, while the statute provides that all departments and agencies of the executive branch of the federal government are required, "to the greatest extent practicable," to cooperate with the states in implementing agency-based voter registration, non-governmental entities are merely "encouraged" to do so. 42 U.S.C. § 1973gg–5(b). Thus, the NVRA clearly provides that non-governmental offices must consent before they can be designated as discretionary voter registration sites. However, the Senate Report on the NVRA states that "[a] comprehensive agency-based program should include private locations and offices, as well as public agencies," and that "[a]n agency program that includes private places at which persons may register to vote may be organized through

cooperative arrangements and agreements between the sponsoring agency and appropriate local or State election officials." Sen. Rep. at 15.

The statute provides that at each designated voter registration site, whether mandatory or discretionary, the following services must be made available: (1) distribution of mail voter applications; (2) assistance to applicants in completing voter registration forms; and (3) acceptance of completed voter registration application forms for transmittal to state election officials. 42 U.S.C. § 1973gg–5(a)(4)(A). The statute specifically provides that any person who assists applicants in filling out voter registration forms may not seek to .influence an applicant's registration, display any party allegiance, discourage an applicant from registering to vote, or make any statement that would lead an applicant to believe that his or her decision to register or not to register would have any bearing upon the eligibility of services. 42 U.S.C. § 1973gg–5(a)(5).

## II. The New York Medicaid Program

The Court's discussion of the Medicaid program in New York is largely drawn from the Stipulation of Facts and Supplemental Stipulation of Facts that were submitted by the parties in lieu of a statement pursuant to Local Rule 56.1. The stipulations were signed by counsel for both sets of plaintiffs, HRA, and the State Board of Elections, but not by counsel for the remaining State defendants. However, unless otherwise indicated, the facts are not in dispute.

The Medical Assistance program, sometimes referred to as the Medicaid or "MAP" program, is a joint state-federal program that provides medical assistance payments for qualified needy persons. Medical assistance is defined as "payment of part or all of the cost of medically necessary medical, dental and remedial care, services and supplies. . . ." N.Y.Soc.Serv.Law § 365–a(2). The program is administered statewide by the State Department of Health,[2] and city-wide by the City's Department of Social

---

2. Prior to October 1, 1996, the Medicaid program was administered by the State Department

of Social Services ("DSS").

Services. Defendant Barrios–Paoli is the Administrator of HRA, and is also the Commissioner of Social Services of the City of New York, and chief executive of the New York City Department of Social Services.

As a general rule, persons who are eligible to receive cash assistance under the Aid to Dependent Children ("ADC") or Home Relief ("HR") programs, or who are disabled within the meaning of the federal Supplemental Security Income ("SSI") statute, are automatically entitled to receive Medicaid benefits. However, because persons not eligible for cash assistance under these programs may also qualify for Medicaid, see N.Y.Soc.Serv. Law § 366–b; N.Y.Comp.Codes R. & Regs., tit. 18, § 360–3.3, New York also accepts applications which only request medical assistance—also known as "Medicaid-only" applications—from persons who do not apply for ADC, HR, or SSI. These motions focus upon the manner in which Medicaid-only applications are processed by HRA.

A needy person applying for Medicaid in the City must submit a completed application to HRA, which reviews and processes the application and ultimately determines whether the person is entitled to receive Medicaid payments. The City has established 19 MAP offices throughout the City at which individuals can apply for medical assistance. Thirteen of the MAP offices are located in outpatient departments of public and private hospitals, and six are free-standing offices. Additionally, the MAP central office on 34th Street in Manhattan also accepts Medicaid applications. Approximately 8,600 applications per month are made in person at the City's MAP offices. All of these MAP offices have been designated by the State as voter registration sites.

Applicants at these MAP offices receive application forms from pre-screeners, who also advise applicants of the information and documentation that will be required to complete the form. As of May 1995, the Medicaid-only application form authorized by DSS has physically incorporated an application for voter registration. Applicants may complete the form either at the MAP office or at home. Approximately one week after HRA receives a completed application form, the prospective applicant is given an appointment for a face-to-face interview, at which a MAP eligibility worker reviews the application and supporting documentation. While HRA contends that MAP employees orally advise applicants that they may register to vote and offer assistance with completing voter registration applications both at the pre-screening stage and at the face-to-face interview, plaintiffs dispute this contention.

HRA also accepts Medicaid-only applications from a variety of other sources, including public and private hospitals, nursing homes, health clinics, and community organizations. The City conducts a "certified pre-screener program" at which it trains persons who are not employed by MAP to assist applicants in completing their applications for Medicaid. Many of the persons who assist Medicaid applicants at hospitals, nursing homes, clinics, and community organizations have taken the City program The State Board of Elections has not designated these facilities as voter registration sites. Moreover, HRA and the State defendants have not instructed these facilities about providing voter registration opportunities to Medicaid applicants, nor have they monitored the facilities to determine whether they provide such information on their own.

Approximately 9,000 Medicaid applications are received by MAP each month from approximately 81 public and private hospitals in the City. Some, though not all, of the hospitals assist their patients in completing their Medicaid applications. However, to the extent that hospitals provide such assistance, they do so in order to obtain Medicaid reimbursement for services rendered to the applicant and not pursuant to statute or because of a contractual relationship with HRA. The hospital employees who may assist in the application process are not employed by MAP, and MAP has no supervisory authority over them.

MAP maintains special offices in eleven City hospitals to review inpatient applications for Medicaid; however, these offices do not schedule face-to-face interviews with applicants, and MAP employees do not have any personal contact with the inpatient applicants. Inpatient applications from those hos-

pitals that do not have a MAP office on site are transmitted to the main MAP office at 34th Street for eligibility determinations; however, upon receipt of those inpatient applications, the office does not schedule face-to-face interviews. Plaintiffs allege that approximately 41 private hospitals use a Medicaid application form that does not contain any space for voter registration, and that the remaining 40 public and private hospitals have not consistently used the DSS form that incorporates a voter registration application.

HRA receives approximately 1,800 Medicaid-only applications per month from residents at approximately 308 nursing homes licensed by the State Department of Health. Additionally, HRA receives approximately 1,600 applications per month from approximately 1,237 health clinics and other community organizations. As with the hospitals that forward Medicaid applications to HRA, those nursing homes, clinics, and community organizations that assist applicants in completing forms do so in order to obtain Medicaid reimbursement and not pursuant to statute or by virtue of a contractual relationship with MAP. Similarly, HRA does not conduct in-person interviews with those applicants who submit their completed Medicaid application form through nursing homes, clinics, and community organizations. While HRA maintains that, as a general rule, clinics and community organizations use a version of the DSS application form that physically incorporates a voter registration application, plaintiffs allege that not all clinics and community organizations that transmit applications to MAP use this form and that MAP processes such applications for Medicaid regardless of whether the application form contains a voter registration application.

In addition to the application scheme outlined above, a special set of rules applies to Medicaid applications made by pregnant women and persons applying on behalf of certain children born after September 30, 1983. The federal Medicaid statute requires that Medicaid application forms be made available to pregnant women and those applying on behalf of such children at sites other than local social services offices. *See* 42 U.S.C. § 1396a(a)(55). The intent of this statutory provision is to facilitate the application process and increase access to medical care by permitting applications to be completed at medical facilities rather than at government offices. *See* New York State Department of Social Services Administrative Directive 91 ADM–28 (August 19, 1991), annexed to Supplemental Stipulation of Facts ("Supp.Stip."), at Exh. "1." These sites include "disproportionate share hospital," which are hospitals that participate in the bad debt and charity pool, *see id.;* 42 U.S.C. 1396r–4(b), and Federally–Qualified Health Centers ("FQHCs"), which are those community health centers, migrant health centers, and centers that provide health care to the homeless, under grants from the federal government pursuant to the Public Health Service Act, 42 U.S.C. § 201 *et seq.* *See* 42 C.F.R. § 435.904.

In order to carry out its obligation to provide pregnant women and qualified children with access to the Medicaid program, New York has enacted the Prenatal Care Assistance Program ("PCAP"), N.Y. Pub. Health Law § 2520 *et seq.* In the City, 62 hospitals and clinics have been designated as PCAP providers. These facilities furnish Medicaid application forms, assist applicants in completing the forms and collecting required documentation, and transmit the completed applications and documentation to the City Department of Social Services for eligibility determinations. The City's MAP receives more than 30,000 applications each year from PCAP providers. At those PCAP hospitals that have on-site MAP offices, MAP employees interview applicants. At all other PCAP sites, however, MAP employees do not have contact with applicants and do not conduct face-to-face interviews upon submission of the completed applications. The 62 PCAP providers have not been designated as either mandatory or discretionary voter registration sites. Moreover, the "Growing Up Healthy" application form that is used by PCAP applicants does not physically incorporate a voter registration form.

## III. Implementation of New York's Agency–Based Voter Registration Program

In 1994, New York amended its Election Law to bring it into compliance with the

requirements of the NVRA. 1994 N.Y.Sess. Laws, ch. 659. With a few exceptions not relevant here, these amendments became effective on January 1, 1995. Election Law § 5–211, as amended, designated the DSS as a public assistance agency that was required to provide voter registration opportunities. The statute also required that all agencies of local government that furnished such assistance also provide for voter registration. The statute designated as mandatory voter registration sites the following state agencies that provide services to people with disabilities: (1) the Department of Health; (2) the Department of Labor; (3) the Office for the Aging; (4) the Division of Veterans' Affairs; (5) the Office of Mental Health; (6) the Office of Vocational and Educational Services for Individuals with Disabilities; (7) the Office of Mental Retardation and Developmental Disabilities; (8) the Commission for the Blind and Visually Handicapped; (9) the Office of Alcoholism and Substance Abuse Services; (10) the Office of the Advocate for the Disabled; and (11) all other offices which administered programs established or funded by such agencies.[3] The statute also designated as discretionary voter registration sites the Department of State and the Division of Workers' Compensation. The statute required the Board of Elections to work with the United States Department of Defense to develop procedures for including recruitment offices as voter registration sites, and with the Immigration and Naturalization Service to ensure that mail-in voter registration applications were included with materials given to new citizens. Finally, the statute required that all institutions of the State University of New York and the City University of New York provide voter registration materials to students at the beginning of each school year and in January of every year in which a presidential election was scheduled to take place.

On April 28, 1995, David C. Flanagan of the New York State Board of Elections sent a letter to MAP's Alicia Hamill, which stated, in pertinent part:

> [W]e would like to advise that as of this date we have not determined how best to proceed in handling the administration of agency-based voter registration with regard to institutional care, hospital eligibility or certified pre-screening programs.
>
> Therefore, until further notice from this office, please do not make any arrangements with the approximately 2,500 locations within these programs with regard to training, supplies, or procedures connected with implementation of agency-based voter registration at their sites.

Stipulation of Facts ("Stip."), at ¶ 72. In a Board of Elections report entitled "NVRA: Two Year Review," issued in November 1995, the Board of Elections asked DSS "to compile a list of all agencies/programs/offices, such as nursing homes and clinics, that provide DSS forms to clients, in order that the Board of Elections may begin to consider what role they play in the NVRA program." *Id.* at ¶ 73. However, to date, the Board of Elections has not designated such facilities as voter registration sites.

The Board of Elections' present position that the NVRA does not require the designation of such facilities as mandatory voter registration sites is consistent with the initial interpretation of the NVRA by the United States Department of Health and Human Service ("HHS"). On July 16, 1996, HHS issued Medicaid State Operations Letter # 96–18, which provided, in pertinent part:

> For purposes of the NVRA, "public assistance offices" include any site where an individual may apply or receive an application for public assistance and a State, city [or] county employee is involved in furnishing or receiving that application, including Medicaid outstation locations. Medicaid outstation locations that are staffed by non-government employees, such as employees of a provider of medical services, are not considered public assistance offices for purposes of the NVRA and are thus not required to provide voter registration assistance under the law. However, under

---

**3.** The statute was amended in 1996 to designate the Department of Health as a state agency providing public assistance, to designate the Commission on Quality of Care for the Mentally Dis-abled as a state agency providing services to people with disabilities, and to omit the Department of Health as such an agency. 1996 N.Y.Sess.Laws, ch. 200, § 7.

section 7(a)(3)(A) of the NVRA, States at their option and with the agreement of the office, may designate other offices within the State as voter registration agencies. Federal financial participation is available for voter registration assistance provided by public assistance offices including assistance provided at Medicaid outstations staffed by non-government employees.

Stip. at ¶ 75.

In August 1996, HHS, after conferring with the Department of Justice ("DOJ"), changed its original position and instead indicated that "the intent and letter of the NVRA would best be carried out by a broader interpretation of the term 'public assistance offices' to include all Medicaid outstations, including those that are staffed by non-government employees." Letter from Bruce Vladek, Administrator, Health Care Financing Administration, HHS, to Acting Assistant Attorney General Loretta King, dated August 26, 1996, annexed to Stip. at Exh. "G." On January 23, 1997, HHS issued Medicaid State Operations Letter # 97–03, which formally stated its new position:

> The purpose of this letter is to issue a clarification concerning the National Voter Registration Act (NVRA) of 1993. After extensive discussions with the [DOJ], we have determined that it is necessary to change our policy position on what constitutes a "public assistance office" for purposes of the NVRA.
>
> As you are aware, we had interpreted the term "public assistance office" to exclude Medicaid outstations staffed by non-government employees. However, DOJ reviewed this policy and determined that the NVRA would be best carried out by broadening the term "public assistance office" to include all Medicaid outstations, including those that are staffed by non-government employees.
>
> In view of this change, voter registration assistance must now be offered at any site where an individual may apply or receive an application for public assistance, includ-

ing sites that are staffed by non-government employees.

Stip., at ¶ 77; Exh. "H."

## IV.  The Present Litigation

On October 9, 1996, the DIA plaintiffs commenced their action against the Commissioner of HRA in the United States District Court for the Southern District of New York. The action was transferred to this District by order of the Honorable Whitman Knapp dated November 25, 1996. Thereafter, the DIA plaintiffs amended their complaint to add the Commissioner of the State Department of Health and the Acting Commissioner of DSS as defendants. The amended complaint seeks certification of the following putative class:

> [A]ll persons who are citizens of the United States and residents of New York State who have applied for Medicaid benefits or Medicaid recertification at a public hospital, private hospital, or MAP site within New York City since January 1, 1995, and who meet all requirements for eligibility to vote in federal elections in New York State except that they 1) have never registered to vote; 2) are not validly registered to vote because they have moved since they last registered to vote; 3) are not registered because they have changed their name since they last registered; 4) are registered but wish to change party affiliation for purposes of voting in future primaries; or 5) are unsure of their registration status and therefore wish to register and receive confirmation by mail that they are registered.

First Amended Complaint, at ¶ 15.[4] The complaint, which is directed only at the implementation of the NVRA at public assistance offices in the City, alleges two broad categories of violations. First, the DIA plaintiffs allege that HRA has failed to ensure that Medicaid applicants who apply for benefits at offices that *have* been designated as voter registration sites are routinely asked if they wish to register to vote, are provided with a combined Medicaid application/voter

---

4.  The parties agreed at a December 19, 1996 conference before the Court that the issue of class certification would be stayed pending reso-

lution of certain preliminary issues, including the issues raised in these motions.

registration forms, and are given proper assistance in completing the forms. Second, the DIA plaintiffs also allege that HRA has violated the NVRA by failing to ensure that *all* private and public hospitals provide voter registration in accordance with the NVRA. The DIA plaintiff's contend that this conduct constitutes a violation of the NVRA, 42 U.S.C. § 1983, and New York Election Law § 5–211, and they seek, *inter alia,* declaratory relief pursuant to 28 U.S.C. § 2201, a preliminary and permanent injunction, and attorney's fees pursuant to the NVRA, 42 U.S.C. § 1973gg–9(c), and 42 U.S.C. § 1988.

On November 13, 1996, the Government filed its complaint in *United States of America v. State of New York, et al.* The Government's action, which is directed more broadly at alleged state-wide violations of the NVRA, alleges that: (1) all of the offices that the State has designated as voter registration agencies are not providing voter registration opportunities; (2) all persons seeking assistance at these sites are not being offered the opportunity to register to vote; (3) voter registration sites are not providing potential registrants with a form that complies with the requirements of the NVRA; (4) voter registration sites are not providing each applicant who declines to register to vote "the same degree of assistance with regard to the completion of the registration application form as is provided by the office with regard to the completion of its own forms," 42 U.S.C. § 1973gg–5(a)(6)(C); and (5) the State has not designated as voter registration agencies all offices in the State that provide public assistance, and has not implemented voter registration at all offices in the State that provide state-funded programs that primarily engage in providing services to persons with disabilities.[5] The Government also seeks, *inter alia,* a declaration pursuant to 28 U.S.C. § 2201 that the defendants are not in compliance with the NVRA.

## V. The Parties' Contentions

The legal issue posed by the three pending motions is thus rather narrow—whether the State is required to designate the subject facilities as mandatory voter registration sites. These motions for partial summary judgment do not address the manner in which the NVRA has been implemented outside of the City, although the Court's determination of these motions will have a practical effect upon the continued viability of such claims. Similarly, these motions do not involve plaintiffs' entirely separate allegation that existing voter registration sites are not fully in compliance with the NVRA.

The DIA plaintiffs contend that: (1) the clear language of the NVRA, its legislative history, and the broad purposes underlying its enactment require that public and private facilities that process Medicaid applications be designated as mandatory voter registration sites; and (2) HRA is ultimately liable for the failure of such facilities to comply with the NVRA because HRA is the City agency that is charged with the responsibility for overseeing the Medicaid program.

The Government contends that: (1) HRA has undertaken a *de facto* delegation of its statutory duty to administer the Medicaid program to the subject facilities; therefore, the clear language of the NVRA requires that such sites be designated as voter registration sites; (2) a finding that the subject facilities are mandatory voter registration sites is consistent with the legislative history of the statute; and (3) the Attorney General's interpretation of the NVRA to require such designation is entitled to deference.

HRA contends that: (1) the subject facilities are not "offices . . . that provide public assistance" because they do not provide "medical assistance" as that term is defined in the New York Social Services Law; (2) the legislative history of the NVRA indicates that Congress did not intend that the facilities be designated as mandatory voter regis-

---

5. By order dated March 10, 1997, these two cases were consolidated for purposes of discovery with a third case that raises a similar challenge to New York's implementation of the NVRA entitled *Association of Community Organizations for Reform Now (ACORN) v. George E.* *Pataki, Thomas R. Wilkey, Brian Wing, Barbara DeBuono, and Marva Livingston Hammons* (Case No. 96–CV–1260, filed March 20, 1996), which has also been assigned to these Chambers. There are currently no motions pending in the *ACORN* case.

tration sites; (3) the plain language of the NVRA, which excludes non-governmental offices from the mandatory provisions of the NVRA, indicates that Congress did not intend that these facilities be designated mandatory voter registration sites; (4) DOJ's interpretation of the NVRA is not entitled to deference; (5) HRA is not legally responsible for the alleged failure of private facilities to furnish voter registration information; and (6) the subject facilities are necessary parties that must be joined pursuant to Federal Rule of Civil Procedure 19(a)(2).

The State defendants (apart from the State Board of Elections, which has filed its own brief) agree with HRA that the language and legislative history of the NVRA indicate that the subject facilities need not be designated as mandatory voter registration sites. Additionally, the State defendants argue that the mandatory designation of those subject facilities that are private would implicate employees' First Amendment rights, since the NVRA expressly prohibits employees of a voter registration agency from seeking to influence an applicant's political preference or party affiliation and from displaying any such preference or affiliation. In its separate brief, the Board of Elections agrees with the other defendants that plaintiffs' position is inconsistent with the language and legislative history of the NVRA, and additionally contends that it has acted aggressively to expand voter registration opportunities in the State.

## DISCUSSION

**I. Standard on a Motion for Summary Judgment in the Context of Declaratory Relief**

■ The Government and the DIA plaintiffs both seek a declaration from the Court that the defendants are not fully in compliance with the NVRA. They seek relief pursuant to 28 U.S.C. § 2201(a), which provides, in pertinent part:

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party

seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

Issuance of a declaratory judgment is appropriate "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Continental Cas. Co. v. Coastal Savings Bank,* 977 F.2d 734, 737 (2d Cir.1992); *see also Starter Corp. v. Converse, Inc.,* 84 F.3d 592, 597 (2d Cir.1996); *Texport Oil Co. v. M/V Amolyntos,* 11 F.3d 361, 366 (2d Cir.1993).

■ In determining a motion for summary judgment that is filed in the context of a declaratory judgment action, the same standard is applicable as in any other action. *See PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1111 (2d Cir.1997). Thus, summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden is on the moving party to identify those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits that it believes demonstrates the absence of a genuine issue of material fact. See *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. All ambiguities must be resolved, and all inferences drawn, in favor of the nonmoving party. *See D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998); *Repp v. Webber,* 132 F.3d 882, 889 (2d Cir. 1997). The judge's role in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Beatie v. City of New York,* 123 F.3d 707, 710–711 (2d Cir.1997).

## II. The NVRA and Principles of Statutory Construction

### A. Is the Attorney General's interpretation of the NVRA entitled to deference?

■ The Government argues that the Attorney General's interpretation of the NVRA—that all facilities that process Medicaid applications must be designated as voter registration sites—is entitled to deference because the Attorney General is the executive officer charged with enforcing the statute. 42 U.S.C. § 1973gg–9(a). It is well established that "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer...." *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also Linea Area Nacional De Chile, S.A. v. Meissner,* 65 F.3d 1034, 1039 (2d Cir.1995). The Supreme Court has explained that such deference is appropriate " 'whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy ... has depended upon more than ordinary knowledge respecting the matters subject to agency regulations.' " *Chevron U.S.A.,* 467 U.S. at 844, 104 S.Ct. 2778 (quoting *United States v. Shimer,* 367 U.S. 374, 382, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961)).

■ However, "[a] precondition to deference under *Chevron* is a congressional delegation of administrative authority." *Adams Fruit Co. v. Barrett,* 494 U.S. 638, 649, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990). The NVRA delegates no such authority to the DOJ. As the Government has itself acknowledged, the DOJ is not authorized to promulgate rules interpreting the NVRA. *See* Government's Memorandum of Law in Support of Motion for Summary Judgment, at 37–38 ("Gov't Mem.") ("Congress specifically authorized the United States Attorney General to undertake appropriate civil actions to enforce the NVRA, but did not provide the Attorney General with substantive rulemaking authority. Accordingly, when the Attorney General seeks to enforce the NVRA and a state responds by challenging the application of the statute ... the questions raised ... are reserved to this Court.") (internal citations and footnotes omitted). The statute delegates extremely narrow rulemaking authority regarding the development of voter registration forms and assessment of the impact of the NVRA to the Federal Election Commission, not the DOJ. 42 U.S.C. § 1973gg–7(a). Nor can it be said that the Attorney General was given the authority to "administer" the NVRA. The statute requires each state to designate an official "to be responsible for coordination of State responsibilities under this subchapter." 42 U.S.C. § 1973gg–8. The Attorney General's powers under the NVRA are limited to commencing civil actions "as is necessary to carry out" the purposes of the statute. 42 U.S.C. § 1973gg–9(a). Yet the Attorney General's authority in that regard is hardly exclusive; the statute, in fact, expressly provides for a private right of action and the recovery of attorney's fees. 42 U.S.C. § 1973gg–9(c).

Under these circumstances, the Court does not consider the Government's position in this litigation to be entitled to *Chevron* deference. While it is true that the Supreme Court gives deference to the Attorney General's interpretation of the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq., see, e.g., Presley v. Etowah County Comm'n,* 502 U.S. 491, 508–509, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992), the Supreme Court has explained that such deference is appropriate "in light of the extensive role the Attorney General played in drafting the statute and explaining its operation to Congress." *United States v. Board of Commissioners of Sheffield, Alabama,* 435 U.S. 110, 131–132, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978). By contrast, there is absolutely no indication in the statutory language or legislative history of the NVRA that the Attorney General served a comparable role in respect to this statute. Thus, having determined that the Government's arguments are entitled to no special weight, the Court turns to an analysis of the language of the NVRA to determine whether it supports the position of the Government and the DIA plaintiffs.

### B. What is the plain meaning of the phrase "all offices in the State that provide public assistance"?

■ "It is clear that the 'starting point in every case involving construction of a stat-

ute is the language itself.'" *In re Boodrow,* 126 F.3d 43, 49 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1055, 140 L.Ed.2d 118 (1998) (quoting *Kelly v. Robinson,* 479 U.S. 36, 43, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986)); *see also United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). "In the usual case, where the language of the statute is clear, that is the end of the analysis." *Lewis v. Grinker,* 965 F.2d 1206, 1215 (2d Cir.1992). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997).

The parties' dispute centers upon the proper interpretation of the language "all offices in the State that provide public assistance." HRA and the State defendants contend that the subject facilities do not "provide" Medicaid, which they maintain is the *payment* for medical services rendered. By contrast, the Government and the DIA plaintiffs focus their attention upon the words "all offices," and argue that this language should be read expansively to include both public and private offices at which individuals may apply for Medicaid. As will be set forth more fully below, the Court concludes that the term "all offices in the State that provide public assistance" does not encompass the subject facilities because: (1) these offices do not provide "assistance" as defined by statute; (2) interpretation of the words "all offices" to include every office in the State at which individuals may apply for Medicaid leads to absurd results; and (3) plaintiffs' position is undermined by the structure of the NVRA itself, which draws a careful distinction between the voter registration obligations of governmental and non-governmental offices.

### 1. Do the subject facilities provide "assistance"?

The federal Medicaid statute defines "medical assistance" as *"payment* of part or all of the cost" of certain enumerated services to individuals "whose income and resources are insufficient to meet all of such cost." 42 U.S.C. § 1396d(a) (emphasis added). Similarly, New York's Social Services Law defines "medical assistance" as *"payment* of part or all of the cost of medically necessary medical, dental and remedial care, services and supplies, as authorized in this title." N.Y.Sec.Serv.Law § 365–a(2) (emphasis added). The emphasis of the statutory definitions is not upon the furnishing of medical care, therefore, but upon the federal and state governments' statutory obligation to compensate for the cost of such care. Based upon these statutory definitions, it does not appear that hospitals, clinics, and nursing homes that offer qualified needy individuals medical care actually provide "assistance" within the meaning of these statutes.

The Government contends, however, that because HRA has engaged in a *de facto* delegation of its responsibility to administer the City's Medicaid program to the subject facilities, the facilities are integral parts of the City's implementation of the Medicaid program and thus qualify as offices that "provide public assistance."[6] The Court is not so convinced. As the Stipulation of Facts makes clear, with the exception of PCAP providers, the subject facilities do not provide such services in accordance with statute, nor do they have any contractual relationship with HRA. They make Medicaid applications available to their needy patients in their own self-interest, in order to ensure that they will be reimbursed for services rendered. Moreover, the Stipulation of Facts also makes it clear that, unlike those applicants who appear in person at MAP offices, patients at hospitals and nursing homes who apply for Medicaid have probably not made an affirmative decision to seek out and interface with the State's public assistance network. Rather, they apply for medical assistance because they are ill or have been injured, and have consequently received medical care from a facility that wishes to be compensated for services rendered.

---

**6.** Implicit in this argument is the notion that HRA is ultimately answerable for violations of the statute by these facilities and could conse-

quently be held responsible for attorney's fees and other litigation costs. *See* 42 U.S.C. § 1973gg–9(c).

While the Court is concerned by indications in the record that HRA has failed to ensure that all individuals who apply for Medicaid by mail and not in person receive personal interviews, see N.Y.Soc.Serv.Law § 366–a(1), especially since the Social Services Law expressly provides that local social services departments cannot delegate their responsibility to conduct interviews, investigate Medicaid applications, or ultimately decide whether to grant Medicaid assistance, N.Y.Sec.Serv.Law § 366–a(6), the issue is not whether HRA's system for processing the thousands of Medicaid applications it receives every year complies with the Social Services Law. Perhaps that issue will be litigated another day. Rather, it is whether the subject facilities should be deemed *de facto* branches of HRA for purposes of the NVRA. The Court concludes that HRA's acceptance of Medicaid applications from these facilities, even in light of its alleged failure to comply with the letter of the Social Services Law in respect to the interviewing of Medicaid applicants, is not enough to convert facilities that have their own separate existences, purposes, and agendas, into "offices ... that provide public assistance." The plain language of the statute simply does not compel such a result.

The same result must obtain for PCAP providers that do not have a MAP office on site. As noted above, the purpose of making Medicaid applications available to pregnant women at sites other than local social services offices was to bring more pregnant women and qualified children into the Medicaid system by making it easier for them to apply for assistance at local health care facilities. The mere fact that these providers are required by statute to make Medicaid applications available does not change the character of such institutions or mandate that they be treated any differently from those other public and private facilities that make Medicaid applications available to their patients. The PCAP providers whose names are annexed to the Supplemental Stipulation of Facts at Exhibit "N" are hospitals and clinics located throughout the City. The mission of these providers is the delivery of medical care, not the administration of the State's public assistance program. For the reasons set forth above, therefore, the Court can find

no basis in the record for determining that these particular providers should be deemed "offices ... that provide public assistance."

### 2. What is the plain meaning of the term "all offices"?

The DIA plaintiffs and the Government emphasize the plain meaning of the word "all," arguing that the statute should be interpreted as applying to every office in the State that provides public assistance, regardless of whether it is a governmental or nongovernmental office. "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States,* 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993); *see also Skubel v. Fuoroli,* 113 F.3d 330, 335 (2d Cir.1997). Webster's defines the word "all" as "[t]he total entity or extent of," or "[t]he whole number, amount, or quantity of," Webster's II New Riverside Univ. Dictionary 93 (1988), while Black's Law Dictionary defines "all" as "the whole of." Black's Law Dictionary 74 (6th ed.1990).

Yet the Government has expressly conceded it is not attempting to have "each private doctor's office which make[s] Medicaid applications available to its patients ... subject to the NVRA." Gov't Mem. at 3–4. Presumably, the Government's concession is based upon its recognition that it would be absurd for this Court to interpret the NVRA as requiring the State to designate every doctor's office in the City at which individuals may apply for Medicaid as a voter registration site. *See Salute v. Stratford Greens Garden Apartments,* 136 F.3d 293, 297 (2d Cir.1998) ("Courts may adopt a restricted rather than the literal or usual meaning of a statute where acceptance of that literal meaning would lead to absurd results....") (internal quotation omitted). Plaintiffs are thus in the unenviable position of having to concede that "all" only means "all" some of the time. In addition, the Government has not offered any mechanism for drawing principled distinctions between those facilities that should be designated and those that need not be designated. Thus, it is not entirely clear where or how the Government has drawn the line between those institutions that process Medicaid applications *and* quali-

fy as public assistance offices, and those institutions that process Medicaid applications that do not so qualify. A small doctor's office possesses at least as many of the characteristics of an "office," which is defined by Black's Law Dictionary as "[a] place for the regular transaction of business or performance of a particular service," Black's Law Dictionary 1083, as a large hospital, which would presumably have administrative offices for the billing of Medicaid patients. In short, the Court concludes that plaintiffs' argument that the term "all offices" should be read broadly to encompass non-governmental as well as governmental offices is fraught with both procedural flaws and logical inconsistencies.

### 3. The structure of the NVRA

■ "It is well-established that in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and its object and policy.'" *United States v. Arnold,* 126 F.3d 82, 88–89 (2d Cir.1997) (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313 (2d Cir.1995)) (other internal quotations omitted). Turning to the structure of NVRA's agency-based registration subsection, the Court again observes that the NVRA draws a careful distinction between mandatory sites, which include offices that provide public assistance, and discretionary sites, which "may" include "non-governmental offices, *with the agreement of such offices."* 42 U.S.C. § 1973gg–5(a)(3)(B)(i) (emphasis added). The statute "encourage[s]" nongovernmental entities to cooperate with the states in carrying out the mandates of the NVRA; it does not require them to do so, 42 U.S.C. § 1973gg–5(b). It is important to point out that plaintiffs contend that both public *and* private facilities must be designated as voter registration sites if they accept Medicaid applications and send them on to HRA. Thus, plaintiffs' interpretation of the statute could conceivably require that private facilities that do no more than occasionally hand a Medicaid application to a patient provide the full range of voter registration services mandated by the NVRA. This reading of the NVRA, which would conscript private facilities into service rather than merely "encourage" them to cooperate, would effectively render nugatory the provision requiring nongovernmental facilities to agree before they may be designated as voter registration sites. The Court concludes, therefore, that plaintiffs' interpretation of the statute to require designation of such facilities is manifestly inconsistent with the NVRA's two-tiered system for agency-based voter registration.

In sum, for the foregoing reasons, the Court determines that the plain meaning of the term "all offices in the State that provide public assistance" does not encompass the subject facilities.

### C. Is the legislative history of the NVRA consistent with plaintiffs' position?

■ The Supreme Court has held that where the meaning of a statute is plain, "'the sole function of the courts is to enforce it according to its terms,'" *Ron Pair Enterprises,* 489 U.S. at 241, 109 S.Ct. 1026 (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). However, "[i]t is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute." *Bob Jones Univ. v. United States,* 461 U.S. 574, 586, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983); *Arnold,* 126 F.3d at 89; *Skubel,* 113 F.3d at 335. It is also appropriate to consult the legislative history "'where the scope of a statutory provision is not made crystal clear by the language of the provision....'" *In re Palm Coast, Matanza Shores Ltd. Partnership,* 101 F.3d 253, 257 (2d Cir.1996) (quoting *Berger v. Heckler,* 771 F.2d 1556, 1571 (2d Cir.1985)). Despite the fact that the Court concludes that the plain language of the statute does not require that the subject facilities be designated as mandatory voter registration sites, in light of plaintiffs' argument that the drafters of the NVRA intended that it be read broadly to carry out its remedial purposes, the Court turns to a discussion of the legislative history.

A motivating factor behind the enactment of the NVRA was Congress' perception that the declining number of voters that partici-

pated in federal elections—only about half of the voting age population in 1988—was attributable in part to difficulties encountered by individuals who want to register to vote. Sen. Rep. at 2. In its discussion of the agency-based voter registration subsection of the NVRA, Congress noted that:

> If a State does not include either public assistance, agencies serving persons with disabilities, or unemployment compensation offices in its agency program, it will exclude a segment of its population from those for whom registration will be convenient and readily available—the poor and persons with disabilities who do not have driver's licenses and will not come into contact with the other principle [sic] place to register under this Act.

Conf.Rep. at 19.

The floor debates in both the Senate and the House do not offer much support to either plaintiffs or defendants. While a cursory review of the debates regarding agency-based registration is replete with broad language to the effect that "state" or "government" agencies that offer public assistance would qualify as mandatory voter registration sites, the bill's proponents did not address whether private offices that were involved in some capacity in the processing of public assistance applications would also fall within the scope of the mandatory voter registration provision. *See, e.g.,* 139 Cong.Rec. S5747 (daily ed. May 11, 1993) (statement of Sen. Durenberger) ("The motor-voter bill provides for voter registration at driver's license stations, registration by mail, and registration at certain State agencies."); 139 Cong.Rec. H2265 (daily ed. May 5, 1993) (statement of Rep. Rose) (applicants who do not have driver's licenses "will be able to register at various governmental agencies or through the mail."); 139 Cong.Rec. H1824 (daily ed. April 1, 1993) (statement of Rep. Swift) (statute would assist the poor and disabled who do not have driver's licenses because people in these categories "are most likely to require frequent visits to one kind of a government agency or another, and that those agencies, which typically would deal with them, will also provide them with an opportunity to register to vote...."); 139

Cong.Rec. S2995 (daily ed. March 17, 1993) (statement of Sen. Kennedy) ("the bill also encourages states to permit registration at Government agencies that provide public assistance or unemployment compensation, and at other agencies that serve the general public."); 139 Cong.Rec. H506 (daily ed. February 4, 1993) (statement of Rep. Swift) ("For those in economic distress, we say in those agencies where they are most likely to seek help they will have an opportunity to apply for registration there as well."); 139 Cong. Rec. H504 (daily ed. February 4, 1993) (statement of Rep. Lowey) ("This bill ... will also offer registration opportunities at public agencies including those which serve the poor and the disabled."). However, one of the bill's opponents in the Senate squarely addressed the issue of private offices:

> If a person or organization is an office—what is it, is it a person or an organization? What is an office? But if it is, and he or it provides services related to public assistance, he or it must be covered under the provisions of this act, pure and simple. S.460 does not define the term office. It does not, for example, specify whether this section applies only to State offices or also corporate offices and charitable organizations which provide services related to public assistance. But ... it is clear that the term office must include private as well as State facilities.... This is a lawyer's delight, Mr. President. We can all have different kinds of interpretations on this bill. This will be a lot of fun.
>
> . . . .
>
> What is this going to involve? How many employees are these people going to have to hire to do this? Each of these persons or organizations could be required to distribute mail registration materials, provide assistance to applicants, and to submit completed voter registration materials, presumably at their own expense and risk, I might add. Any organization which refuses to do so runs the considerable legal risk of suit under section 11 for monetary damages, punitive damages and legal fees.

139 Cong.Rec. S2758 (daily ed. March 11, 1993) (statement of Sen. Smith). Nonetheless, proponents of the legislation did not

elaborate upon the scope of the agency-based registration provision in response to Senator Smith's concerns, and the issue of what constitutes an "office" for purposes of mandatory voter registration did not resurface over the course of the Senate debates. Senator Smith's stated interpretation of the statute is not entitled to any particular weight. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 311, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) ("The remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history."); *General Media Communications, Inc. v. Cohen*, 131 F.3d 273, 283 n. 13 (2d Cir.1997) ("[T]he motivations of individual legislators, to the extent we may be able to discern them, are not dispositive."). Indeed, the Court observes that Senator Smith was a staunch opponent of the legislation who made this statement on behalf of an amendment that would have delayed the NVRA's effective date until Congress appropriated sufficient funds to cover the cost to the states of implementing the statute. Thus, it is apparent that Senator Smith had a clear incentive to exaggerate the potential cost of the statute, and his interpretation of the word "office" must be considered in that context.

The House and Senate reports accompanying their versions of the NVRA are more telling. Both reports stated in identical language:

> [E]ach State must designate *all public offices* in the State of those agencies that provide public assistance, unemployment compensation, or related services ... In addition the State must designate additional Federal[,] State or local governmental agencies as well as private sector offices as registration agencies, but each State is given discretion as [to] which agencies and what offices of those agencies to include.

Sen. Rep. at 27; House Rep. at 11 (emphasis added). By indicating specifically that only the public offices of public assistance agencies need be designated as mandatory voter registration sites, the reports arguably showed some awareness that private offices may be involved in the administration of public assistance programs. Yet such language clearly suggests that the drafters intended that only public offices that administer public assistance programs qualify as mandatory sites.

Furthermore, the issue of cost as addressed in both reports argues against plaintiffs' interpretation of the agency-based registration provision. The Congressional Budget Office's ("CBO's") estimate of the proposed cost of the statute was appended to both the House and Senate reports. The CBO estimated that the statute would cost states and localities an average of approximately $20 million per year for the first five years of the program, *see* Sen. Rep. at 41; House Rep. at 25; however, this estimate was premised upon the assumption that "[i]n most states, motor/voter would become the primary method of registering voters." Sen. Rep. at 43; House Rep. at 27. Accordingly, the $20 million figure was referable only to those additional expenses that would be incurred by state motor vehicle offices in implementing the statute. In respect to agency-based registration, the CBO indicated that "this would not be a major source of registering voters, and the costs are not expected to be significant in aggregate, although some additional training costs might be necessary to expand the pool of people able to assist voters in completing the forms." Sen. Rep. at 46; House Rep. at 30. Thus, the understanding of the bill's supporters, as reflected by the CBO estimate, was that the cost of implementing agency-based voter registration would be minimal. It is difficult to square this understanding of the cost of implementing the program with plaintiffs' argument that the statute mandates the designation of more than 1,600 facilities within the City as voter registration sites, not to mention the potential liability for costs and attorney's fees if these sites, many of which are private entities, fail to comply with the NVRA.

Moreover, although it is unclear from the plaintiffs' papers whether they expect the City to staff these facilities with properly trained personnel or whether they anticipate that private employees will undertake this function, it appears that either possibility would run contrary to the intent of the statute's drafters. If plaintiffs contemplate that City personnel will be dispatched to these 1,600 sites across the City, the costs of imple-

menting the program will be greatly beyond that anticipated by Congress. By contrast, if plaintiffs contemplate that private employees will undertake this role, then the statute's language regarding the voluntary and cooperative role to be played by private entities in the implementation of agency-based voter registration will be rendered a nullity. This is not to say, of course, that some or all of the subject facilities might not be appropriate discretionary voter registration sites. Indeed, the Court observes that certain of the PCAP providers would appear to be ideal voter registration sites. However, once again, pursuant to the clear language of the NVRA, the consent of non-governmental facilities would have to be obtained before they could be designated as voter registration sites.

While the Court applauds the goals underlying the NVRA and notes that it has streamlined voter registration procedures and brought voter registration to places where the disabled and the needy most frequently seek help, the Court nonetheless concludes that plaintiffs have simply gone too far in their efforts to compel New York to designate the subject facilities as mandatory voter registration sites. In their focus upon the laudable goals of the NVRA, plaintiffs have lost sight of the problems the subject facilities face in meeting the heath care needs of their constituent communities. At a time when the delivery of adequate and cost-effective health care is an increasing challenge, plaintiffs seek to compel entities that provide medical treatment, not public assistance, to shoulder a costly civic responsibility that has absolutely nothing to do with their function as care givers. As *amicus curiae* Healthcare Association of New York points out, the remedy sought by plaintiffs would have "widespread and systemic implications" upon the administration of health care in this State and "would place an administrative and cost burden on those facilities which have volunteered to assist in the Medicaid application process." *Amicus Curiae* Memorandum of Law of Healthcare Association of New York, at pp. 1–2. The Court cannot conclude that the subject facilities, which are constrained to navigate the administrative minefield of the City's Medical Assistance Program, must now become quasi-voter registration centers and further divert their funds and focus from their essential responsibility—to provide quality health care.[7]

## CONCLUSION

For the foregoing reasons, and because a declaratory judgment will serve a useful purpose in clarifying the legal relations in issue and will afford relief from the uncertainty and controversy that gave rise to this action, the Court hereby declares that the subject facilities do not qualify as "offices in the State that provide public assistance," and consequently, the defendants have not violated the NVRA by failing to designate the subject facilities as mandatory voter registration sites. Accordingly, plaintiffs' motions for partial summary judgment are denied, and defendant HRA's motion for partial summary judgment is granted. To the extent that HRA seeks joinder of those City health care facilities that process Medicaid applications as necessary parties, its motion is denied as unnecessary.

**SO ORDERED.**

---

**7.** Because of the Court's conclusion, it need not consider the State defendants' argument that requiring private facilities to provide voter registration services in accordance with the NVRA would violate the First Amendment rights of their employees.