DISABLED IN ACTION OF METROPOLITAN NEW YORK, Jovita Acosta, Tisheca Luckey and the United States of America, Plaintiffs–Appellants,

v.

Marva L. HAMMONS, Administrator, New York City Human Resources Administration, Barbara A. DeBuono, Commissioner, New York State Department of Health, Brian J. Wing, Acting Commissioner, New York State Department of Social Services, State of New York, George E. Pataki, Governor of the State of New York; James L. Stone, Commissioner, New York State Department of Mental Health, Thomas A. Maul, Commissioner, New York State Department of Mental Retardation and Developmental Disabilities, Richard P. Mills, Commissioner, New York State Department of Education, John L. Behan, Director, New York State Department of Veterans' Affairs, Walter G. Hoefer, Director, New York State Office of the Aging, Jean Somers Miller, Commissioner, New York State Alcoholism and Substance Abuse Services, Alexander F. Treadwell, New York State Secretary of State, Robert R. Snashall, Chairman, New York State Workers' Compensation Board and

Thomas R. Wilkey, Executive Director, New York State Board of Elections, in their official capacities. Defendants–Appellees.

Docket No. 98–9536

United States Court of Appeals, Second Circuit.

Argued: Nov. 15, 1999

Decided: Jan. 26, 2000

Juan Cartagena, Community Service Society of New York, New York, NY, for Plaintiffs–Appellants Disabled in Action of Metropolitan New York, Jovita Acosta and Tisheca Luckey.

Jennifer Levin, United States Department of Justice, Civil Rights Division, Washington, DC (Bill Lann Lee, Acting Assistant Attorney General, Zachary W. Carter, United States Attorney for the Eastern District of New York, Sanford M. Cohen, Marla Tepper, of counsel; Mark L. Gross, on the brief), for Plaintiff–Appellant United States of America.

Vincent Leong, Assistant Attorney General of the State of New York (Eliot Spitzer, Attorney General of the State of New York, of counsel; Michael S. Belohlavek, on the brief), for State Defendants–Appellees.

Dona B. Morris, Assistant Corporation Counsel of the City of New York (Michael D. Hess, Corporation Counsel of the City of New York, of counsel; Francis F. Capu-

to, Paul Marks, on the brief), for Defendant–Appellee Marva L. Hammons.

Before: KEARSE, McLAUGHLIN, and KATZMANN, Circuit Judges.

KATZMANN, Circuit Judge:

Plaintiffs Disabled In Action of Metropolitan New York, Jovita Acosta, Tisheca Luckey and the United States appeal from judgments dated October 21, 1998 and February 23, 1999 (Frederic Block, *J.*) denying their motions for partial summary judgment and granting defendants' motion for partial summary judgment. Plaintiffs argued that defendants violated the National Voter Registration Act, 42 U.S.C. § 1973gg *et seq.*, by failing to designate as mandatory "voter registration agencies" approximately 1,600 public and nongovernmental hospitals, nursing homes, clinics, community-based organizations and other offices in New York City that assist individuals with the Medicaid application process. The district court concluded that these entities need not be so designated and granted partial summary judgment in favor of defendants. For the reasons stated below, the judgments of the district court are affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.

## BACKGROUND

This appeal arises from two cases consolidated for purposes of discovery in the Eastern District of New York, both of which challenged the "agency-based" voter registration system that the City and State of New York have implemented pursuant to the enactment of the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C. § 1973gg *et seq.* The first case was brought by Disabled in Action of Metropolitan New York, a New York-based not-for-profit organization that advocates on behalf of the disabled, and by two individuals, Jovita Acosta and Tisheca Luckey (collectively, "DIA"), against Marva L. Hammons in her capacity as Commissioner of the Human Resources Administration of the City of New York (hereinafter referred to as "HRA" or the "City"),[1] as well as Barbara A. DeBuono in her capacity as Commissioner of the New York State Department of Health, and Brian J. Wing in his capacity as Acting Commissioner of the New York State Department of Social Services ("DSS") (collectively, the "State"). The United States brought the second case against the State and 12 State officials (collectively, the "State"), and the City.

In order to evaluate plaintiffs' arguments on appeal, it is necessary to first discuss the statutory framework of the NVRA and the City's Medicaid application procedures.

### 1. *The NVRA*

As the district court noted, Congress enacted the NVRA to "establish procedures ... [to] increase the number of eligible citizens who register to vote in elections for Federal office" and to "enhance[ ] the participation of eligible citizens as voters in elections for Federal office." 42 U.S.C. § 1973gg(b)(1), (2). The Act establishes three separate procedures by which States must provide voter registration opportunities. First, the Act's so-called "motor voter" provision requires States to allow citizens to register to vote at the same time that they register for a driver's license. *See* 42 U.S.C. § 1973gg–3. Second, the Act mandates that States provide voter registration opportunities by mail. *See id.* at § 1973gg–4. Third, § 1973gg–5 of the Act requires States to make such opportunities available at certain State-designated office sites: a procedure also known as "agency-based" registration.

---

1. On February 18, 1997, Lillian Barrios–Paoli succeeded Marva L. Hammons as the Com- missioner of the HRA.

This appeal concerns the agency-based registration requirement of § 1973gg–5.

Under § 1973gg–5(a)(2):

Each State shall designate as voter registration agencies [VRAs]—

(A) all offices in the State that provide public assistance; and

(B) all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities.

In addition to the "mandatory" VRAs of § 1973gg–5(a)(2), under § 1973gg–5(a)(3):

(A) ... [E]ach State shall designate other offices within the State as [VRAs].

(B) [VRAs] designated under subparagraph (A) may include—

(i) State or local government offices such as public libraries, public schools, offices of city and county clerks (including marriage license bureaus), fishing and hunting license bureaus, government revenue offices, unemployment compensation offices, and offices not described in paragraph (2)(B) [of § 1973gg–5(a) ] that provide services to persons with disabilities; and

(ii) Federal and nongovernmental offices, with the agreement of such offices.

Thus, while a State must designate some offices as "discretionary" VRAs under § 1973gg–5(a)(3), the choice of which offices will be so designated is left to the State.

The NVRA further provides that:

[a]ll departments, agencies, and other entities of the executive branch of the Federal Government shall, to the greatest extent practicable, cooperate with the States in carrying out [agency-based registration], and all nongovernmental entities are encouraged to do so.

*Id.* at § 1973gg–5(b).

Offices designated as mandatory or discretionary VRAs must, in addition to the services they normally provide, furnish voter registration application forms to applicants, offer applicants assistance with the completion of those forms, and accept completed forms for transmittal to the appropriate State election official. *See id.* at § 1973gg–5(a)(4)(A).

### 2. *The New York Medicaid Program*

New York's Medical Assistance Program ("Medicaid" or "MAP") is a joint federal-State program that provides medical assistance payments for qualified needy persons. *See* 42 U.S.C. § 1396 *et seq.* The State Department of Health administers the program through 58 local social service districts, of which New York City is one. The New York City social service district is headed by the Commissioner of HRA.

An individual applying for Medicaid [2] in New York City must submit a completed application to HRA, which reviews the application and determines the individual's eligibility. Medicaid-only applications are accepted at the MAP central office in Manhattan, as well as at 19 MAP offices located throughout the City. Thirteen of these offices are situated in the outpatient departments of public and private hospitals, while the rest are free-standing. HRA employees staff these offices, which the State has designated as mandatory VRAs under § 1973gg–5(a)(2)(A) of the Act. Approximately 8,600 applications per month are made in person at these offices.

**2.** Individuals who are eligible to receive cash assistance under the Aid to Dependent Children ("ADC") or Home Relief ("HR") programs, or who are disabled within the meaning of the federal Supplemental Security Income ("SSI") statute, 42 U.S.C. § 1381 *et seq.*, are automatically entitled to receive Medicaid benefits. Individuals not eligible for ADC, HR or SSI assistance may nevertheless apply for Medicaid, *see* § 18 N.Y.C.R.R. 360–3.3; such individuals are known as "Medicaid-only" applicants. This appeal involves offices that assist Medicaid-only applicants in the New York City social service district.

This appeal involves two groups of offices in the New York City social service district that provide Medicaid applications, and in some cases assistance with those applications, but have not been designated by the State as either mandatory VRAs under § 1973gg–5(a)(2)(A) or discretionary VRAs under § 1973gg–5(a)(3)(A). The first group includes over 1,500 [3] public and nongovernmental hospitals, nursing homes, health clinics, community organizations and other offices.[4] The vast majority of these offices are nongovernmental, and none are staffed by MAP or HRA employees. Neither HRA nor MAP has supervisory authority over the employees of these offices. However, many—although apparently not all—of the employees of these offices have taken a "certified prescreener program" offered by the City; this program trains people not employed by HRA to assist Medicaid applicants with the completion of their applications. Over 1,700 persons have been trained and certified through this program. Although all of these offices provide Medicaid applications, not all of them routinely assist applicants with the applications. Those offices that do assist applicants do so in order to obtain Medicaid reimbursement and not pursuant to statute or by virtue of a contractual relationship with the City or State. MAP receives approximately 12,400 applications per month from these offices.

The second group of offices is made up of 62 hospitals and clinics that serve pregnant women and persons applying on behalf of certain children born after September 30, 1983. Under the federal Medicaid statute, Medicaid application forms must be made available to these applicants at sites other than government social services offices. *See* 42 U.S.C. § 1396a(a)(55). In order to carry out its obligations under the statute, the State has enacted the Prenatal Care Assistance Program ("PCAP"), *see* N.Y. Pub. Health Law § 2520 *et seq.*, under which these 62 offices have been designated as PCAP providers. As such, these offices provide Medicaid application forms, assist applicants in completing the forms and collecting required documentation, and transmit completed applications to DSS. Some PCAP hospitals have on-site MAP offices; at those hospitals, MAP employees interview Medicaid applicants. The remaining PCAP sites, however, do not have such offices and MAP employees have no contact with applicants. The 62 PCAP providers transmit approximately 2,500 applications per month to DSS.

### 3. Implementation of New York's Agency–Based Voter Registration Program

In 1994, the State amended its Election Law in order to comply with the requirements of the NVRA. *See* 1994 N.Y. Sess. Laws, ch. 659. Election Law § 5–211, as amended, designates DSS as a mandatory VRA under 42 U.S.C. § 1973gg–5(a)(2)(A). The statute also designates as mandatory VRAs under § 1973gg–5(a)(2)(B) various State agencies that provide services to people with disabilities, and designates as discretionary VRAs under § 1973gg–5(a)(3)(B)(i) the Department of State and the Division of Workers Compensation.

With regard to the offices at issue in this case, the New York State Board of Elections sent a letter to MAP in April 1995 stating:

> [The Board of Elections] would like to advise that as of this date we have not determined how best to proceed in handling the administration of agency-based voter registration with regard to institutional care, hospital eligibility or certified pre-screening programs.

---

**3.** In total, this appeal involves over 1,600 offices as previously noted. Given that the second group is comprised of 62 offices, we estimate that the first group contains between 1,500 and 1,600 offices.

**4.** This group includes 10 public hospitals, and one private hospital, at which MAP maintains special offices to review inpatient applications for Medicaid, but at which MAP employees have no contact with inpatient applicants.

Therefore, until further notice from this office, please do not make any arrangements with the approximately 2,500 locations within these programs with regard to training, supplies, or procedures connected with implementation of agency-based voter registration at their sites.

In November 1995, the Board of Elections asked DSS "to compile a list of all agencies/programs/offices, such as nursing homes and clinics, that provide DSS forms to clients, in order that the Board of Elections may begin to consider what role they play in the NVRA program." The Board of Elections ultimately took the position that the NVRA does not require the designation of these offices as mandatory VRAs under § 1973gg–5(a)(2)(A), and it chose not to attempt to designate them as discretionary VRAs under § 1973gg–5(a)(3).

The Board of Elections' position is at odds with the interpretation of the NVRA currently held by the United States Department of Health and Human Services ("HHS"). Initially, the Board of Elections and HHS were in at least partial agreement; on July 16, 1996, HHS issued Medicaid State Operations Letter # 96–18, which provided in relevant part:

> For purposes of the NVRA, "public assistance offices" include any site where an individual may apply or receive an application for public assistance and a State, city [or] county employee is involved in furnishing or receiving that application, including Medicaid outstation locations. Medicaid outstation locations that are staffed by non-government employees, such as employees of a provider of medical services, are not considered public assistance offices for purposes of the NVRA and are thus not required to provide voter registration assistance under the law. However, under section 7(a)(3)(A) of the NVRA, States at their option and with the agreement of the office, may designate other offices within the State as voter registration agencies.

Federal financial participation is available for voter registration assistance provided by public assistance offices including assistance provided at Medicaid outstations staffed by non-government employees.

HHS changed its position after conferring with the Department of Justice ("DOJ"). An August 1996 letter from HHS to Acting Assistant Attorney General Loretta King stated in relevant part:

> As you know, we had interpreted the term "public assistance offices" to exclude Medicaid outstation locations staffed by non-government employees. However, in light of our recent discussions with your staff and in light of your letter ... [w]e have now come to believe that the intent and letter of the NVRA would best be carried out by a broader interpretation of the term "public assistance offices" to include all Medicaid outstations, including those that are staffed by non-government employees.

On January 23, 1997, HHS issued Medicaid State Operations Letter # 97–03, formally setting forth its new position:

> The purpose of this letter is to issue a clarification concerning the National Voter Registration Act (NVRA) [of] 1993. After extensive discussions with the [DOJ], we have determined that it is necessary to change our policy position on what constitutes a "public assistance office" for purposes of the NVRA.
>
> As you are aware, we had interpreted the term "public assistance office" to exclude Medicaid outstations staffed by non-government employees. However, DoJ reviewed this policy and determined that the NVRA would be best carried out by broadening the term "public assistance office" to include all Medicaid outstations, including those that are staffed by non-government employees.
>
> In view of this change, voter registration assistance must now be offered at any site where an individual may apply or receive an application for public assis-

tance, including sites that are staffed by non-government employees.

### 4. *The Present Litigation*

DIA originally brought suit in the Southern District of New York (Whitman Knapp, *J.*) alleging that HRA had not complied with the NVRA because: (1) HRA had failed to ensure that Medicaid applicants who apply for benefits at offices that have been designated as mandatory VRAs under § 1973gg–5(a)(2)(A) were actually receiving voter registration materials and assistance; and (2) not all hospitals that provide Medicaid applications had been designated as mandatory VRAs. The United States filed a similar suit in the Eastern District of New York (Block, *J.*) against the State and the City, alleging various violations of the NVRA. The complaint included an allegation that not all offices in the State that provide public assistance had been designated as mandatory VRAs, a broader version of the second violation alleged by DIA.

The DIA case was subsequently transferred to the Eastern District of New York, and in March 1997 was consolidated for purposes of discovery with the United States case and a third case similarly challenging the State's implementation of the Act.[5] Thereafter, on a single record consisting of a joint Stipulation of Facts and Supplemental Stipulation of Facts, the parties filed cross-motions for summary judgment on the limited issue of whether the approximately 1,600 public and nongovernmental hospitals, nursing homes, clinics, community organizations and other offices that furnish, in some cases assist applicants with, and transmit to HRA Medicaid applications are "offices in the State that provide public assistance" within the meaning of § 1973gg–5(a)(2)(A) of the NVRA.

In a thorough opinion dated May 7, 1998, the district court granted the defen-

dants' cross-motion for partial summary judgment. *See United States v. New York,* 3 F.Supp.2d 298 (E.D.N.Y.1998). On September 15, 1998 the district court ordered dismissal of DIA's remaining claims pursuant to Fed.R.Civ.P. 41(a)(1)(ii), and DIA filed a notice of appeal on October 16, 1998. Meanwhile, the district court entered a final judgment on its May 7, 1998 order pursuant to Fed. R.Civ.P. 54(b), and the United States filed a notice of appeal on March 15, 1999.

### DISCUSSION

■ We review *de novo* a district court's grant of summary judgment. *See, e.g., Bogan v. Hodgkins,* 166 F.3d 509, 511 (2d Cir.1999). "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). This case turns on the proper interpretation of the language "all offices in the State that provide public assistance" in § 1973gg–5(a)(2)(A). DIA and the United States argue that the offices at issue fit comfortably within this language and must thus be designated as VRAs. The City and State disagree.

The district court concluded that: (1) the offices at issue do not provide "public assistance" because under both federal and New York State law Medicaid is defined as "payment" for medical services, and the offices in question do not provide payment, *see* 3 F.Supp.2d at 309; (2) interpreting the words "all offices" in § 1973gg–5(a)(2)(A) to include every State, local, federal, and nongovernmental office at which individuals may apply for Medicaid leads to absurd results—for example, requiring that individual doctors' offices be designated as VRAs, *see id.* at 310–11; (3) the

---

**5.** That case was *Association of Community Organizations for Reform Now (ACORN) v.*

*Pataki,* 96–CV–1260, filed March 20, 1996.

structure of the NVRA draws a clear distinction between the voter registration obligations of State and local government offices on the one hand, and federal and non-governmental offices on the other, by making optional the participation of federal and non-governmental offices, *see id.* at 311; and (4) the NVRA's legislative history on balance supported the arguments of the defendants. *See id.* at 311–14. The court did not reach the State's argument that requiring nongovernmental offices to undertake VRA duties under the NVRA would violate the First Amendment rights of the employees of those offices. *See id.* at 314 n. 7. We agree with much, though not all, of the district court's reasoning, as well as with the bulk of its conclusions. Our analysis is detailed below.

### 1. The NVRA: Text and Structure

■ In construing the terms of a statute, we look first to the language itself. *See In re Boodrow,* 126 F.3d 43, 49 (2d Cir.1997), *cert. denied,* 522 U.S. 1117, 118 S.Ct. 1055, 140 L.Ed.2d 118 (1998). As stated by the Supreme Court:

> Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent. . . .
>
> The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.

*Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (internal quotation marks omitted).

■ The text of § 1973gg–5(a)(2)(A) is apparently simple: "Each State shall designate as voter registration agencies(A) all offices in the State that provide public assistance." DIA and the United States argue that the plain meaning of this language encompasses all of the mostly non-governmental hospitals, nursing homes, clinics, community-based organizations and other offices at issue here. They point to Congress's use of the word "all" to qualify the word "offices," the use of the preposition "in" rather than "of," and the lack of the term "State or local government" to qualify the word "offices" as it does in another part of the statute. *See* 42 U.S.C. § 1973gg–5(a)(3)(B)(i). The plausibility of this broad interpretation of § 1973gg–5(a)(2)(A) dissolves when the provision is read in the context of the rest of the Act's agency-based registration subsection.

As noted by the district court, this subsection draws a distinction between mandatory VRAs, which include offices that provide public assistance, and discretionary VRAs, which may include various State offices such as public schools and offices of city and county clerks, as well as "[f]ederal and nongovernmental offices, *with the agreement of such offices.*" 42 U.S.C. § 1973gg–5(a)(3)(B)(ii) (emphasis added); *see also United States v. New York,* 3 F.Supp.2d at 311. Section 1973gg–5(b) requires federal offices to cooperate with agency-based registration "to the greatest extent practicable," and merely "encourage[s]" the cooperation of nongovernmental offices.[6]

We believe that this statutory structure requires that the judgment of the district court be affirmed, with minor exceptions. The statutory scheme—with its distinction between State and local government offices on the one hand and federal and nongovernmental offices on the other—provides clear direction with regard to all but a few of the offices at issue. In some cases, Congress did not specifically address the reach of the statute with respect

---

6. The one exception to the federal portion of this provision is Armed Forces recruiting centers, which must be designated as VRAs under § 1973gg–5(c). The Act contains no explicit exceptions to the nongovernmental portion of the provision.

to particular organizational arrangements. We thus seek to apply the statutory framework as best we can, recognizing always that Congress has the final word and may wish to revisit the statutory scheme.

■ We begin with nongovernmental offices, which make up the vast majority of the offices at issue in this case. If the NVRA merely "encourages" nongovernmental cooperation with agency-based registration, it cannot be said that such offices must be designated as mandatory VRAs under § 1973gg–5(a)(2)(A).[7] The same is true for federal offices other than Armed Forces recruiting offices.[8] That States cannot require the participation of federal agencies makes sense given the nature of our federal system. Put simply, the NVRA's mandatory agency-based registration system does not include federal and nongovernmental offices.[9]

■ This leaves a small number of State and local government offices. Several of these offices are New York City public schools. Section 1973gg–5(a)(3)(B)(i) explicitly refers to public schools as one type of State or local government office that may be designated as a discretionary VRA.

We thus conclude that public schools cannot be mandatory VRAs under § 1973gg–5(a)(2)(A).[10]

■ We reverse the district court only with regard to a small number of public hospitals operated by the New York City Health and Hospitals Corporation. As offices of local government in New York State that provide public assistance, these hospitals must be designated as mandatory VRAs under § 1973gg–5(a)(2)(A). We remand this case to the district court so that the parties may identify any and all such other State or local government offices among the offices at issue, and the district court shall then determine their status under the Act in a manner consistent with this opinion.

We also remand this case to the district court with regard to certain PCAP providers. As noted, some PCAP providers contain MAP offices on their premises, and MAP employees at those offices have contact with applicants. The record does not indicate whether this group of PCAP providers is made up entirely of State or City offices, entirely of federal and nongovern-

7. As noted, the nongovernmental offices at issue in this case include one nongovernmental hospital that happens to house a MAP office on its premises. For reasons not explained in the record, this office appears only to make eligibility determinations for inpatient Medicaid applicants and thus does not assist or interview these applicants. The parties have stipulated that the MAP employees in this nongovernmental hospital "do not have contact with [Medicaid] applicants." Stipulation of Facts at 11. As a nongovernmental office, this hospital need not be designated as a mandatory VRA under § 1973gg–5(a)(2)(A). As for the MAP office, it seems to us that if the office has no contact with Medicaid applicants it too need not be designated as a mandatory VRA. See 42 U.S.C. § 1973gg–5(a)(4)(A) (contemplating that offices designated as VRAs will provide voter registration opportunities to "applicants" at those offices).

8. The federal offices at issue include the Office of Congressman Gary Ackerman and facilities operated by the United States Department of Veterans Affairs (DVA). These offices may not be designated as VRAs without their

agreement. See 42 U.S.C. §§ 1973gg–5(a)(3)(B)(ii), –5(b). Based upon an internal opinion of its General Counsel that comports with our interpretation of the NVRA, the DVA appears willing to participate in agency-based voter registration under the NVRA if asked to do so by a State. See Vet. Aff. Op. Gen. Couns. Adv. 13–96 (D.V.A.1996).

9. Construing the NVRA, the Supreme Court has stated: "The States *must* provide ... a system for voter registration at various *state* offices (including those that provide 'public assistance' and those that provide services to people with disabilities)." *Young v. Fordice,* 520 U.S. 273, 275, 117 S.Ct. 1228, 137 L.Ed.2d 448 (1997) (emphasis added). It should be noted that *Young* did not involve the interpretation of § 1973gg–5(a)(2)(A).

10. Even in those cases where a public school is involved with the Medicaid application process, Congress, by explicitly including public schools in the discretionary category, appears to have exempted them from mandatory designation.

mental offices, or is a mix of both. The district court must determine the makeup of this group on remand.

■ Any PCAP provider that is an office of State or local government must be designated as a mandatory VRA under § 1973gg–5(a)(2)(A), regardless of whether it contains a MAP office. Any PCAP provider that is a federal or nongovernmental office, but houses a MAP office on its premises, need not be designated a mandatory VRA. However, if the MAP office in any such PCAP provider assists or interviews Medicaid applicants, the MAP office—but not the PCAP provider—must be designated as a mandatory VRA under §§ 1973gg–5(a)(2)(A).[11]

■ The United States contends that the statutory structure does not mean that discretionary participation is the sole means by which federal and nongovernmental offices, and State and local government offices listed as examples of discretionary VRAs under § 1973gg–(5)(a)(3)(B)(i), may be involved with voter registration. According to the United States, such offices may be either discretionary or mandatory VRAs. Although the United States does not develop this argument, we take it to mean that the statute can be read as differentiating between all offices that provide public assistance and those that do not, regardless of the nature of those offices, rather than as differentiating between State and local government offices that provide public assistance on the one hand and federal and nongovernmental offices on the other. Such an interpretation, however, would render nugatory § 1973gg–5(b), entitled "Federal Government and private sector cooperation." If federal offices need not always cooperate with a State's agency-based registration program, and the private sector is merely encouraged to cooperate, it is hard to see how it can be said that the federal and nongovernmental offices in question must be designated as VRAs under § 1973gg–5(a)(2)(A).

Indeed, despite arguing that the word "all" in § 1973gg–5(a)(2)(A) means "all" regardless of the existence of §§ 1973gg–5(a)(3)(B)(i) and –5(b), the United States concedes that private doctors' offices, which make Medicaid applications available to their patients, are not "offices in the State that provide public assistance" within the meaning of § 1973gg–5(a)(2)(A). The district court concluded that the United States "ha[d] not offered any mechanism for drawing principled distinctions between those facilities that should be designated [as mandatory VRAs] and those that need not be designated." 3 F.Supp.2d at 310. On appeal, the United States argues that although doctors' offices distribute Medicaid applications, they are distinguishable from the offices at issue here because: (1) doctors' offices are not certified as pre-screeners; (2) doctors' offices do not pre-screen applicants; (3) doctors' offices do not interview applicants for purposes of completing application forms; (4) unlike the offices at issue here, doctors' offices do not submit interview Form 2136(a) to HRA; and (5) unlike the offices at issue here, applicants whose applications originate from a doctor's office must still be interviewed by HRA. According to the United States, individual doctors' offices merely distribute applications, while the offices at issue "complete the application process." Offices in New York City that allegedly "complete the application process" and must thus be designated as VRAs under this test include the Girls Club of New York, the Law Office of Jay J. Sangerman and Our Lady of Mercy Church.

We are not persuaded by this argument. Some of the offices at issue in this case provide no assistance to applicants in completing their Medicaid forms. Not all of

---

**11.** If the MAP office in such a PCAP provider were to close or move out of the provider's premises, the PCAP provider would have no obligation under the NVRA to provide voter registration materials.

the persons who assist applicants at these offices are certified as pre-screeners. Not all of these offices submit Form 2136(a) to HRA. In addition, the evidence in the record pointed to by the United States in support of its allegation that doctors' offices do nothing more than provide Medicaid applications is scant. Moreover, in the event that a particular doctor's office did in fact "complete the application process," under the test proposed by the United States the State would be required by the NVRA to designate that office as a VRA; this strikes us an overly expansive reading of the statute. It is hard to imagine that Congress could have intended to require a State to designate as a VRA a private law office or church while leaving the designation of a county clerk's office or State unemployment office to the State's discretion. *See* 42 U.S.C. § 1973gg–5(a)(3)(B)(i). Finally, and most importantly, the United States is unable in any way to anchor the logic of its proposed test in the text of the statute.

■■■ DIA and the United States further argue that the City and State have delegated essential functions of the Medicaid application process to the federal and nongovernmental offices at issue, and by doing so have effectively converted them into "offices in the State that provide public assistance" within the meaning of § 1973gg–5(a)(2)(A), presumably even if that provision applies only to State and local government offices that provide public assistance. They argue that this delegation has occurred even where there are no formal contracts or agreements between the offices at issue and the City or State. According to the plaintiffs, the offices conduct all the tasks typically associated with a State or local government office that provides public assistance, and the delegation encompasses all aspects of the application process other than the ultimate determination of Medicaid eligibility

and the payment of funds.[12] They further note that HRA has no contact with the applicant due to its reliance on these offices. DIA analogizes these facilities to state actors, and the United States claims that they are indeed state actors. Thus, even if a State cannot be required to mandatorily designate a federal or nongovernmental office as a VRA under § 1975gg–(5)(a)(2)(A), the argument goes, the particular offices at issue must be so designated because they are effectively agents of the State.

We disagree with both the state action theory of the United States, and the delegation theory of the United States and DIA, which as set forth by the plaintiffs are essentially the same. A private entity may be deemed a state actor only if "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself," which will be true only when the State "has exercised coercive power or has provided such significant encouragement, either overt or covert," that the action of the private actor "must be deemed to be that of the State." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (internal quotation marks omitted). The relationship between the offices at issue and the City and State does not exhibit the kind of interdependence sufficient to constitute state action under this standard.

As an initial matter, it is altogether unclear whether those offices can even be said to act as agents of the City and State when they assist applicants with the Medicaid application process, because it may well be that these offices act primarily on behalf of the applicant. *See New York City Health & Hospitals Corp. v. Gorman,* 113 Misc.2d 33, 448 N.Y.S.2d 623, 624 (Sup.Ct.N.Y.Co.1982) (holding that when hospital's charges began to exceed pa-

---

12. As noted elsewhere in this opinion, this statement is not entirely correct. The offices

at issue offer varying degrees of assistance.

tient's known financial resources, hospital "had a duty to apply to the [State] on [patient's] behalf for reconsideration of his eligibility [for Medicaid]."); *Mount Sinai Hosp. v. Kornegay,* 75 Misc.2d 302, 347 N.Y.S.2d 807, 809 (N.Y.City Civ.Ct.1973) (noting, in a case where hospital failed to inform patient that her incomplete Medicaid application had been returned to the hospital and later brought an action against patient to recover for cost of medical services rendered, that hospitals have a "duty to ascertain the possible eligibility of the patient or family, give adequate directions and information, and maintain a sufficient continuing interest to insure that eligible patients or family file the required applications and that appropriate action is taken."); § 10 N.Y.C.R.R. 85.40(b)(2) ("Following the determination of a pregnant woman's presumptive eligibility for Medicaid benefits, the PCAP provider shall act as a pregnant woman's authorized representative in the completion of the Medicaid application...."); § 18 N.Y.C.R.R. 360–3.7(d)(6)(iv) (A "qualified [PCAP] provider that has determined a pregnant woman to be presumptively eligible for [Medicaid] must ... offer to represent the ... woman during the remainder of the ... process, including acting as her representative at the personal interview the [State] conducts....").

Even if these offices do in fact act on behalf of the State, plaintiffs have failed to show "a sufficiently close nexus" between the State and the offices that would allow us to find state action. Other than the 62 PCAP providers, none of the offices at issue here are required by the City or State to provide Medicaid applications. To the extent that these offices assist applicants with the Medicaid application process,[13] it appears that they do so in their own self-interest—that is, to obtain Medicaid reimbursement for the services rendered to their patients.[14] "Action taken by

private entities with the mere approval or acquiescence of the State is not state action." *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, ——, 119 S.Ct. 977, 986, 143 L.Ed.2d 130 (1999). While these offices play an important role in the application process, none of them—including the PCAP providers—have the authority to issue or deny Medicaid benefits and, consequently, do not exercise powers that are "traditionally the exclusive prerogative of the State." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 353, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Under these facts, it cannot be said that the offices in question are state actors. Plaintiffs' delegation theory is rejected for the same reasons.

■■ Having disposed of the plaintiffs' textual and text-related arguments, we turn to the City and State's main textual argument, focusing upon § 1975gg–5(a)(2)(A)'s phrase "public assistance." The public assistance in this case, the argument goes, is Medicaid—that is, medical assistance—and both the federal Medicaid statute and New York's Social Services Law define "medical assistance" as *"payment* of part or all of the cost" of medical services. *See* 42 U.S.C. § 1396d(a) (emphasis added); N.Y. Soc. Serv. Law § 365–a(2) (emphasis added). Accordingly, the City and State contend that because the offices at issue either provide medical services or assist applicants with Medicaid applications in connection with those services, rather than provide *payment* for those services, they do not provide "public assistance" (Medicaid) and thus cannot be designated as mandatory VRAs under § 1973gg–5(a)(2)(A). The district court accepted this reasoning, *see* 3 F.Supp.2d at 309, but we do not because it is based on a specialized definition of "public assistance" particular to statutes unrelated to the NVRA. We agree with DIA and the United States that the drafters of the NVRA

---

**13.** As already noted, it has been stipulated that the assistance provided by the offices at issue ranges from fairly comprehensive to none whatsoever.

**14.** While not dispositive, this fact certainly sheds some light on the question.

intended the phrase "public assistance" to have a broader meaning that includes not only the payment process, but the application process as well. However, even though the offices in question do provide "public assistance" within the meaning of the NVRA when they assist Medicaid applicants with their applications, the text and structure of the statute lead us to distinguish as noted above between State and local government offices on the one hand, and federal and nongovernmental offices on the other. The language of §§ 1973gg–5(a)(3)(B)(ii) and –5(b) means that the States may designate federal and nongovernmental offices as VRAs only with the agreement of such offices. We therefore believe that the State and City offices at issue must, except as otherwise noted, be designated as mandatory VRAs, but that the federal and nongovernmental offices at issue may not be designated as VRAs absent their consent.

### 2. *The NVRA: Legislative History*

■ With the text and structure of the NVRA ultimately pointing firmly to such a conclusion, we might very well end our inquiry at this juncture. But the agency-based registration scheme of § 1973gg–5 is not absolutely clear. In that circumstance, legislative history may be consulted in order to confirm the meaning discerned from the text and structure of a statute. *See, e.g., CIA v. Sims,* 471 U.S. 159, 167–68, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985); *In re Palm Coast, Matanza Shores Ltd. Partnership,* 101 F.3d 253, 257 (2d Cir.1996).

■ We focus on the most authoritative and reliable materials of legislative history, including: the conference committee report, committee reports, sponsor/floor manager statement and floor and hearing colloquy. "Because a conference report represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of congressional intent." *Railway Labor Executives Ass'n v. ICC,* 735 F.2d 691, 701 (2d Cir.1984) (citation omit-

ted). The Conference Report supports our interpretation that Congress meant to distinguish between State and local government offices and other offices. It states in relevant part:

> Of those agencies included in the mandatory [agency-based registration] program ..., it appears to the conferees that those agencies most likely to have such contact and complement the motor vehicle agency registration program are those agencies that provide public assistance and services to persons with disabilities. By public assistance agencies, we intend to include those *State* agencies in each State that administer or provide services under the food stamp, medicaid, the Women, Infants and Children (WIC), and the Aid to Families With Dependent Children (AFDC) programs.

H.R. Conf. Rep. No. 103–66, at 19 (1993) (emphasis added), *reprinted in* 1993 U.S.C.C.A.N. 140, 144. Similarly, the House debate on the Conference Report recognized the role of governmental public offices. Representative Charles Rose, one of the managers of the bill, commented:

> Not everyone ... is able to drive or can afford to drive. Those citizens are also entitled to additional opportunities to register. Those who do not have licenses will be able to register at various *government* agencies or through the mail ....
>
> Having applications available at public assistance agencies will help register more people. So will having applications at motor vehicle bureaus, marriage license offices, libraries and other agencies. All of these *government* agencies, and more, will be able to assist people in registering ....

139 Cong. Rec. 9220 (1993) (emphasis added). Another manager, Representative John Conyers, asserted:

> [T]he conference report is a comprehensive voter reform act which restores those provisions removed by the Senate

which would register voters at *public* agencies. In addition to departments of motor vehicles (DMV's), where 90 percent of our population applies for drivers' licenses, the House bill mandates registration at offices of public assistance, and vocational rehabilitation centers.

*Id.* at 9221 (emphasis added).

The conference report stage is closest to final passage and is generally thus the best indicator of legislative meaning apart from the statute itself. It should be noted, however, that even the earlier phases of the legislative process reinforce our interpretation of the NVRA.

The House and Senate Committee reports accompanying their versions of the NVRA state, in identical language, that:

> [E]ach State must designate [as VRAs] all *public* offices in the State of those agencies that provide public assistance, unemployment compensation, or related services.... In addition the State must designate additional Federal, State or local governmental agencies as well as private sector offices as registration agencies, but each State is given discretion as [to] which agencies and what offices of those agencies to include.

H.R.Rep. No. 103–9, at 11 (1993) (emphasis added), *reprinted in* 1993 U.S.C.C.A.N. 105, 115; S.Rep. No. 103–6, at 27 (1993) (emphasis added). In addition, the Senate report states:

> An agency registration program *may* also include private offices and locations throughout a State. An agency program that includes private places at which persons may register to vote may be organized through *cooperative arrangements* and *agreements* between the sponsoring agency and appropriate local or State election officials.

S. Rep. No. 103–6, at 15 (emphasis added). With regard to the provision that eventually became § 1973gg–5(b) of the Act, both reports state in identical language that:

> Subsection (b) requires all entities of the Federal government to cooperate as much as possible with the States in carrying out this program by participating as designated voter registration agencies. This participation requirement is subject to the Federal agency agreeing to participate ....

H.R.Rep. No. 103–9, at 13, *reprinted in* 1993 U.S.C.C.A.N. at 119; S.Rep. No. 103–6, at 29. The reports thus explicitly reject the argument that federal offices fall within the meaning of § 1973gg–5(a)(2)(A) and must thus be designated as VRAs.[15] Although this portion of the reports does not discuss nongovernmental entities, it seems clear to us that if Congress felt that § 1973gg–5(b), which provides that federal agencies "shall" cooperate as much as practicable, made federal participation merely optional, *a fortiori* that section, which states that nongovernmental entities are "encouraged" to cooperate, must also have been viewed as making the participation of nongovernmental agencies merely optional.

We turn next to the floor debates. The district court concluded, after "a cursory review," that the debates "do not offer much support to either plaintiffs or defendants." 3 F.Supp.2d at 312. We reach a different conclusion. In our view, the debates show that the members of Congress most familiar with the legislation—both proponents and opponents—appear to have assumed that § 1973gg–5(a)(2)(A) covers only State and local government offices. Representative Allan Swift, the sponsor of the bill, noted:

---

**15.** At oral argument, counsel for the State attempted to show the inconsistency of the plaintiffs' argument by claiming that the United States had effectively argued that State and nongovernmental offices, but not federal offices, must be designated as VRAs under § 1973gg–5(a)(2)(A). However, Point III of the United States reply brief is entitled "Nongovernmental Entities and Federal Agencies May Be Discretionary or Mandatory Agency-Based Registration Sites." Reply brief at 7.

There is this small group of people with unique problems that will not be assisted by the motor-voter portion of the bill, and we said those are people who by the very nature of the condition that prevents them from driving a car are most likely to require frequent visits to one kind of a *government* agency or another, and that *those* agencies, which typically would deal with them, will also provide them with an opportunity to register to vote . . . .

. . . . Our bill says [a State] *shall* provide the opportunity to register in *these* agency offices.

139 Cong. Rec. 7174 (1993) (emphasis added). Representative William Thomas, a member of the Committee to which the House bill was referred and an opponent of the bill, offered a motion to instruct stating, in relevant part, that:

The second specific of the motion to instruct is to address the area in which the *State* provides an opportunity other than the department of motor vehicles for citizens of the State to register . . . .

. . . . Welfare . . . agencies in a particular State [are] required under [the bill] to provide this outreach. All other agencies and departments [are] optional . . . .

. . . . My only argument is let the States make the decision, do not force it on them.

*Id.* Representative Pat Roberts, another Committee member who was opposed to the bill, stated that:

[A] major flaw in the bill [is][t]he mandatory voter registration of individuals applying for . . . welfare benefits. This mandatory requirement unfairly targets the recipients of various benefits programs, while making the registration at other *State* agencies voluntary for State

governments. Why have some agencies been made mandatory and others voluntary?

*Id.* at 7175 (emphasis added). Representative Bob Livingston, another member of the Committee, stated:

Unlike the House bill, the Senate-passed bill does not discriminate against taxpayers. The Senate bill allows the States to decide which *State* agencies will offer voter registration. The Senate version does not prevent the States from selecting welfare or unemployment offices; it merely leaves the decision up to the States.

*Id.* (emphasis added).

■ During the Senate debate on the bill, Senator Mitch McConnell, a member of the Committee to which the Senate bill was referred and an opponent of the bill, declared that the bill would:

discriminate against taxpayers in favor of welfare recipients. It will force States to provide voter registration services at all *public assistance agencies.* Many *States and localities* do not have *civil service.* Many *States and localities* have *those kinds of offices* manned by *patronage workers.* Then, if States have any money left over, the bill will allow States to provide voter registration at places like tax offices and hunting license offices.

*Id.* at 5096 (1993) (emphasis added). Combined with the House and Senate reports, these statements are *strong evidence that* § 1973gg–5(a)(2)(A) refers only to public assistance offices of State and local governments.[16]

The plaintiffs argue that the legislative history supports their interpretation of the Act. The United States relies primarily on the Conference Report. It argues first

---

16. The district court noted statements of other members of Congress that comport with the ones discussed herein. *See* 3 F.Supp.2d at 312. We give little weight to these statements because they were made by members of Congress other than the sponsors, Committee members and managers of the House and Senate bills. The district court also noted one statement of a Senator that is contrary to our interpretation of the statute. *See id.* We discuss this statement later in this opinion.

that because the Conference Report states that "[b]y public assistance agencies, we intend to include those *State* agencies in each State that *administer or provide* services under the food stamp, medicaid, ... WIC ... and ... AFDC ... programs," H.R. Conf. Rep. No. 103–66, at 19 (emphasis added), *reprinted in* 1993 U.S.C.C.A.N. at 144, Congress intended to include the federal and nongovernmental offices at issue here because they allegedly help to "administer" the Medicaid program. We do not accept this argument. Congress was clearly referring to *"State"* agencies that "administer or provide" Medicaid, not federal and nongovernmental offices.

██ Second, the United States points to the Conference Report's reference to the WIC program, which provides "supplemental foods and nutrition education through any eligible local agency that applies for participation." 42 U.S.C. § 1786(a). The WIC statute defines "local agency" as "a public health or welfare agency or a private nonprofit health or welfare agency." *Id.* at § 1786(b)(6). The United States argues that in light of this definition the Conference Report's reference to WIC offices as offices that provide public assistance under the terms of § 1973gg–5(a)(2)(A) would be meaningless if that provision does not include nongovernmental offices. We are not persuaded. WIC "local agencies" include both private and public offices, and our interpretation of § 1973gg–5(a)(2)(A) would require a State to designate as mandatory VRAs all WIC "local agencies" that are offices of State and local government. Federal and nongovernmental offices that are WIC "local agencies" could be designated as discretionary VRAs under § 1973gg–5(a)(3)(B)(ii), but not without their agreement. *See* 42 U.S.C. §§ 1973gg–5(a)(3)(B)(ii), –5(b).

Lastly, the United States notes that the Senate had passed an amendment providing, in effect, that "[t]he agency program at offices that provide public assistance,

unemployment compensation and related services is made discretionary with the States." H.R. Conf. Rep. No. 103–66, at 18, *reprinted in* 1993 U.S.C.C.A.N. at 143. In other words, under the Senate amendment there would have been no class of offices subject to mandatory designation as VRAs.[17] The Conference Committee rejected this amendment because it would have "permit[ted] States to restrict their agency program and defeat a principal purpose of this Act—to increase the number of eligible citizens who register to vote." *Id.* at 19. The United States fails to explain the relevance, for our purposes, of the failure of this amendment, although we presume the government's point to be that Congress was obviously determined to expand voter registration opportunities and, accordingly, interpreting § 1973gg–5(a)(2)(A) to include federal and nongovernmental offices is thus not only consistent with the broad goals of the statute, but was also Congress's specific intent. While we agree that the goal of the NVRA is to increase voter registration opportunities and, thereby, voter turnout, the rejection of this particular amendment does not convince us, in the face of the text and of more specific and convincing legislative history to the contrary, that the United States is correct.

To support its position, DIA relies primarily on the views of one Senator who was not a floor manager or a member of the committee from which the measure emanated. During floor debate, Senator Robert C. Smith expressed serious reservations about the Senate bill. He focused first on the mandatory agency-based registration language of the bill, which, as he quoted, stated: "[E]ach State shall designate as voter registration agencies all offices in the State that provide public assistance, unemployment compensation, *or related services.*" 139 Cong. Rec. 4856 (1993) (emphasis added); *see* S. 460, 103d Cong. § 7 (1993) (Feb. 25, 1993 version). The "or related services" language ultimately was not enacted into law. *See* 42

---

**17.** It was to this difference between the House and Senate bills that Representative Livingston was referring in his statement quoted on 126 of this opinion.

U.S.C. § 1973gg–5(a)(2)(A). Senator Smith continued:

> If a person or organization is an office— what is it, is it a person or an organization? What is an office? But if it is, and he or it provides *services related to* public assistance, he or it must be covered under the provisions of this act, pure and simple. [The bill] does not define the term office. It does not, for example, specify whether this section applies only to State offices *or also corporate offices and charitable organizations which provide services related to public assistance.* But reading it in the context of paragraph (3)(B), it is clear that the term office must include private as well as State facilities.
>
> Paragraph (3)(B) also states that "Voter registration agencies may include local government offices and nongovernmental offices."[18] So it is clear that the term office encompasses all corporations, charitable organizations, local government offices, and other organizations and private individuals *which have the requisite relationship to the provision of public services.*

139 Cong. Rec. 4856. Senator Smith later offered a proposed amendment to the Senate bill providing that no State would be required to designate as a VRA any private charitable organization, retail establishment, job provider, corporation, social service center or nursing home. *See* 139 Cong. Rec. 5157–58 (1993). The proposed amendment was not enacted into law. According to DIA, Senator Smith's statement and the failure of his proposed amendment are conclusive proof that Congress intended § 1973gg–5(a)(2)(A) to include nongovernmental offices.

We disagree. Senator Smith's interpretation of the provision appears to have been based in large part on the "or related services" language in the bill at that time, which clearly broadened the scope of the provision—language which ultimately did not survive. Counsel for DIA omits Senator Smith's use of this language in the portion of Senator Smith's statement quoted in its brief, and in one sentence misquotes the Senator.[19] We also note that Senator Smith's proposed amendment was tabled, an action that is a procedural rather than a substantive vote. *See id.* at 5157. In addition, Senator Smith's proposed amendment concerned several aspects of the Senate bill, of which the status of nongovernmental offices was but one. *See id.* at 5157–58. Thus, the fact that the Senate tabled the proposed amendment does not provide strong evidence that the Senate intended § 1973gg–5(a)(2)(A) to include nongovernmental entities, as the proposed amendment could have failed because of its treatment of other aspects of the bill. Lastly, Senator Smith's statement and proposed amendment are contrary to both the Senate Report[20] they followed and the Conference Report[21] they preceded.

In sum, the most reliable portions of the Act's legislative history—the Conference Report, the statements of committee managers and members both for and against

---

**18.** This statement is a paraphrase of paragraph 3(B).

**19.** *Compare* brief at 24 ("[The bill] does not ... specify whether this section applies only to State offices or also corporate offices and charitable organizations which provide public assistance") (quoting Senator Smith) *with* 139 Cong. Rec. 4856 ("[The bill] does not ... specify whether this section applies only to State offices or also corporate offices and charitable organizations which provide *services related to* public assistance.") (statement of Senator Smith) (emphasis added). In the absence of any indication to the contrary, we assume that counsel's misquotation was a mistake.

**20.** "An agency registration program *may* also include private offices and locations throughout a State. An agency program that includes private places at which persons may register to vote may be organized through *cooperative arrangements* and *agreements* between the sponsoring agency and appropriate local or State election officials." S.Rep. No. 103–6, at 15 (emphasis added).

**21.** "By public assistance agencies, we intend to include those *State* agencies in each State

the legislation, the committee reports, and the statement of a sponsor—confirm our textual analysis of § 1973gg–5(a)(2)(A): federal and nongovernmental offices are not "offices in the State that provide public assistance" within the meaning of § 1973gg–5(a)(2)(A). Accordingly, the City and State did not violate the Act by failing to designate the federal and non-governmental offices at issue as mandatory VRAs under that provision.[22] The State and City remain free, of course, to designate these offices—with their agreement—as discretionary VRAs under § 1973gg–5(a)(3)(B)(ii), but the NVRA does not require them to do so.

### Conclusion

We have considered all of plaintiffs' arguments and, except as indicated above, find them without merit. Accordingly, the judgments of the district court are affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.

**22.** As a result, we do not reach the State's argument that requiring nongovernmental employees to perform certain VRA duties, *see* 42 U.S.C. § 1973gg–5(a)(5), would violate their First Amendment rights.